UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY NORMA SAYAD,<br><br>    Petitioner,<br><br>  v.<br><br>WALTER MILLER, warden,<br><br>    Respondent.<br>                                      / | No. C 13-1915 SI (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

## INTRODUCTION

Cindy Norma Sayad filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition is denied.

## BACKGROUND

Procedural History

Sayad was found guilty by a jury in Contra Costa County Superior Court of felony driving under the influence of alcohol and causing injury and felony driving with 0.08% or greater blood-alcohol level and causing injury. Clerk's Transcript ("CT") at 132-35. The jury also found true an enhancement for inflicting great bodily injury and a special allegation for driving with a blood-alcohol level exceeding 0.08%. CT at 135. The jury also found true that Sayad had suffered three prior convictions. CT at 250-52. Sayad was sentenced to prison for ten years. CT at 305-09.

Sayad appealed and filed a petition for writ of habeas corpus. The California Court of

Appeal affirmed the conviction and denied the habeas petition. The California Supreme Court denied review. Sayad then filed this action, seeking a writ of habeas corpus. On July 3, 2013, this court issued an order to show cause on the claims that: (1) Sayad received ineffective assistance of counsel in that counsel failed to call witness Samantha Gilmore; (2) Sayad's Sixth Amendment right to confrontation was violated when the trial court improperly excluded evidence relevant to a prosecution witness' credibility; and (3) the cumulative effect of these errors denied her due process. Respondent filed an answer and Sayad filed a traverse.

The Crime

The following factual background is taken from the order of the California Court of Appeal:

> The criminal charges against defendant arose from a pedestrian-car collision that occurred March 6, 2008, some time after 6:00 p.m. at dusk, on Clayton Road near its intersection with Roselyn Drive in a business district of Concord. At its intersection with Roselyn Drive, Clayton Road runs east and west, with two lanes in each direction. There is a middle left-turn lane dividing the eastbound and westbound lanes. The speed limit on Clayton Road is 35 miles per hour and there are no stop signs controlling the traffic. There are marked crosswalks, a crosswalk sign for pedestrians crossing Clayton Road at its intersection with Roselyn Drive, and a fluorescent pedestrian sign, which is visible for about one thousand feet for drivers traveling east on Clayton Road.
>
> While attempting to cross Clayton Road near its intersection with Roselyn Drive, Desiree Harding was struck in the eastbound number one traffic lane (the lane closest to the middle left turn lane) by a car driven by defendant, who had a blood-alcohol concentration exceeding 0.15 percent. Harding suffered severe and disabling injuries.
>
> At the 2010 trial, the prosecution presented the testimony of several witnesses including eyewitness Christopher DeFlippo, Harding's boyfriend at the time of the collision; eyewitness Robert Fisher, who was walking near the intersection at the time of the collision; Concord City Police Officer Tony Zalec, who took a statement from defendant shortly after the collision; and collision reconstruction expert Concord Police Officer Eric Olson.
>
> DeFlippo testified that before attempting to cross Clayton Road, he and Harding looked to see if there was any eastbound traffic. Seeing no nearby cars, they began to cross the road in a northerly direction inside the crosswalk, with Harding walking "pretty quickly" and slightly ahead of DeFlippo, who was walking with his bicycle. DeFlippo was in the eastbound number two lane (closest to the curb), when Harding was struck by defendant's car in the eastbound number one lane. Before the impact, DeFlippo saw defendant's car about 30 feet from the crosswalk and coming "very rapidly," and he tried to get Harding's attention by calling her name. Harding, who was then looking to see if there was any westbound traffic, did not react to DeFlippo, and she was struck by defendant's car before he could say her name a second time. When Harding was hit, defendant's car was

partially in the crosswalk and partially outside the crosswalk. DeFlippo denied that immediately before the impact he had been riding his bicycle and he did not recall a car almost hitting him as he crossed the road.

Fisher testified that he first heard defendant's car suddenly decelerating as it approached the crosswalk on Clayton Road. As he turned in reaction to the decelerating sound, he saw defendant's car just west of the crosswalk and then heard an "impact sound," which was defendant's car striking Harding in the eastbound number one lane. Fisher could not tell if Harding had been walking in a southerly or northerly direction or if she was struck inside or outside the crosswalk. Defendant's car stopped in the middle of the crosswalk or just past the crosswalk. Before the collision between defendant's car and Harding, Fisher did not see DeFlippo or another car almost collide with DeFlippo.

In her statement to Police Officer Zalec, defendant explained that on the evening in question she was traveling at 35 miles per hour, the speed limit, in the eastbound number two lane on Clayton Road in moderate traffic. As defendant approached the eastern-most part of the intersection with Roselyn Drive a pedestrian (later identified as Harding) suddenly appeared from the right-hand side and ended up directly in front of her vehicle. "[W]hen that happened she had no time to apply the brakes so therefore there was no braking before impact." Defendant was not sure whether she had moved into the eastbound number one lane of traffic immediately before her car struck Harding who just appeared "from the sky." FN2 When asked to clarify her statement, "appeared from the sky," defendant stated that Harding came "from [defendant's] right-hand side," i.e., the south side of Clayton Road. After the collision defendant saw several pedestrians, including a man with a bicycle, but she never mentioned anything about seeing a bicyclist or a pedestrian with a bicycle before the collision.

> FN2. None of the eyewitnesses testified to seeing defendant traveling in the eastbound number two lane or swerving immediately before the collision with Harding. Prosecution expert Olson testified that he examined the collision scene and found skid marks only in the eastbound number one lane just before, through, and just past the crosswalk leading directly to where defendant's car was stopped in the eastbound number one lane after the collision. Olson saw no fresh skid marks at all in the eastbound number two lane or any skid marks in that lane "right up to the crosswalk ... or immediately thereafter."

Prosecution expert Olson testified that the collision was avoidable regardless of the direction (northbound or southbound) and place (inside or outside the crosswalk) that Harding crossed Clayton Road. According to Olson, as defendant drove on Clayton Road towards the Roselyn Drive intersection, there were no "impediments of visibility" that would have precluded her from seeing Harding as she left the curb to cross the road, and defendant had sufficient time to stop her car before hitting Harding. When asked the basis of his opinion, Olson testified that he had relied on DeFlippo's version of the collision to the extent it was consistent with the physical evidence found at the collision scene, which was depicted in photographs shown to the jury. Even if DeFlippo's version of the collision was ignored, Olson would still conclude that the collision was avoidable based on the other evidence including Fisher's testimony, defendant's statement to the police, and the physical evidence found at the collision scene.

Defendant attempted to raise a reasonable doubt as to her criminal liability by presenting the testimony of eyewitness Adam Solla, and the testimony of a collision reconstruction expert forensic engineer Peter Rast. Solla testified that just prior to the collision he was inside Kasper's restaurant with his girlfriend Samantha Gilmore. FN3 As Solla looked

out the open front door of the restaurant, he saw both DeFlippo riding a bicycle and Harding walking across Clayton Road in a southerly direction—outside the crosswalk. Harding stopped momentarily in the middle left turn lane while DeFlippo rode across the eastbound lanes. DeFlippo almost collided with a car traveling in the eastbound number two lane (the lane closest to the curb). After the car drove away and DeFlippo reached a safe location, he turned and indicated to Harding not to proceed. While looking in DeFlippo's direction, and not at the traffic, Harding "stumbled ran" into the middle of the eastbound number one lane of traffic where she was struck by defendant's car traveling in that lane. The impact between Harding and defendant's car occurred "maybe six to eight seconds" after the near collision between DeFlippo and another car.

> FN3. After the collision, the police interviewed Gilmore, and she later testified at the preliminary hearing in this matter. However, Gilmore was not called to testify at the trial by either party.

Defense expert Rast testified that he could not ascertain either Harding's walking direction or when defendant should have first seen Harding as she left the curb to cross Clayton Road. Rast also testified that if he relied solely on DeFlippo's version of the collision, Rast would join in Olson's opinion that defendant had enough time to stop her car before hitting Harding. However, Rast opined that it was probably not within defendant's ability to avoid hitting Harding based on Solla's statement to the police and his preliminary hearing testimony. Rast conceded that if defendant had seen Harding as she left the northern curb and entered Clayton Road proceeding in a southerly direction, then defendant should have been able to stop her car before hitting Harding. However, if defendant were faced with two or more events requiring her to react, then her perception/reaction time would be greatly increased. Rast had seen studies showing "anywhere from 200 to 500 percent increase in perception/reaction time." Rast also testified that it was common knowledge that the consumption of alcohol could play a significant part in a driver's ability to timely react to different events in the road.

In closing, the prosecutor presented two theories for imposing criminal liability based on separate scenarios. First, the prosecutor argued that the evidence demonstrated that Harding was crossing Clayton Road in a northerly direction in the crosswalk when she was struck by defendant's car, that defendant had a duty to yield the right of way to a pedestrian in the crosswalk, and that defendant had sufficient time to see and react to Harding but failed to avoid hitting Harding because defendant was driving under the influence of alcohol. Alternatively, the prosecutor argued that even if Harding was crossing Clayton Road in a southerly direction outside the crosswalk, as testified to by Solla, defendant still had a duty to use reasonable care towards a pedestrian crossing the road, and that defendant had sufficient time to see and react to Harding and could have avoided hitting Harding had defendant not been driving under the influence of alcohol.

Defense counsel argued in her closing argument that defendant's drunk driving was not the cause of the collision because even if she had been driving sober she would not have had sufficient time to avoid hitting Harding. Defense counsel asked the jury to infer that defendant must have been distracted by the near collision between DeFlippo and another car and, at about the same time, Harding "dart[ed]" or "jump[ed]" from the middle left-turn lane onto the eastbound number one lane of traffic leaving defendant with insufficient time to avoid hitting Harding.

*People v. Sayad*, 2012 WL 469804 *1-4 (Cal. App. 1 Dist. 2012).

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Contra Costa County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**DISCUSSION**

1. <u>Ineffective Assistance of Counsel</u>

Sayad first argues that trial counsel was ineffective for failing to call Samantha Gilmore as a witness at trial.

<u>Standard</u>

The Sixth Amendment to the United States Constitution guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, *see id.* at 691-94.

6

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689). The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Id.* at 788 (quotation and citations omitted). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Furthermore, trial counsel cannot be ineffective for failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *see, e.g., Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of defendant's prior sexual misconduct as propensity evidence not ineffective where evidence would have been admitted to show common plan or intent).

Analysis

The California Court of Appeal set forth the relevant legal standards and denied this claim:

> In her petition for habeas corpus relief, defendant argues that her trial counsel was ineffective for failing to call Samantha Gilmore as a witness. In her declaration filed with the petition, defendant's trial counsel stated that she was aware that to some extent the trial would involve a credibility contest between DeFlippo and other witnesses, but counsel chose not to call Gilmore as a witness because her preliminary hearing testimony was very similar to Solla's testimony. Defendant argues that her trial counsel's reason for

7

not calling Gilmore as a witness was unreasonable because Gilmore's testimony would have allowed the jury to consider a second witness who would corroborate Solla's testimony.

. . .

. . . . Contrary to defendant's contention, the evidence submitted in support of her petition fails to demonstrate that her trial counsel was incompetent. As explained in her declaration, trial counsel chose not to call Gilmore after considering her credibility as a witness and reviewing her preliminary hearing testimony and determining that Gilmore's testimony would be very similar to Solla's testimony. That trial counsel decided not to challenge the prosecution's case by using Gilmore's testimony does not demonstrate incompetency. "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates. All that happened here is that counsel pursued a course that conformed to the first option." (*Harrington*, *supra*, 131 S.Ct. at p. 790.) As recognized by the United States Supreme Court, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." (*Strickland*, *supra*, 466 U.S. at p. 690.)

Additionally, even if trial counsel should have called Gilmore as a witness, defendant has not shown such failure was prejudicial. . . . Defendant argues that Gilmore's testimony would have made a difference because it would have corroborated Solla's testimony. However, on this record, we fail to see how Gilmore's corroborative testimony would have helped defendant. Prosecution expert Olson testified that he rejected the preliminary hearing testimony of both Solla and Gilmore because it was inconsistent with the physical evidence found at the collision scene. The jurors heard Solla's testimony and could have reasonably rejected it for the same reason that Olson had discounted it. Even if Gilmore testified at trial, it is likely the jurors would have rejected her corroborative testimony for the same reason that they rejected Solla's testimony. Nor do we see any significance to the fact that during their deliberations the jury asked for Gilmore's "statement." FN16 The jurors' request could have been made for various reasons, and proves nothing by itself. Absent any indication as to why the jurors asked for Gilmore's "statement," no inference can be drawn as to how that information would have impacted the verdicts or that a more favorable outcome was reasonably probable had Gilmore testified at trial.

> FN16. In their note, the jurors also requested, among other things, defendant's "statement," and clarification regarding the injuries to Harding's left leg. The trial court sent a written response, advising the jury that (1) "[s]tatements of persons who did not testify at trial are not evidence in the trial and may not be used by the jury to determine the issues before it. The decision of the jury must be solely upon the evidence that was presented in the trial;" and (2) "[t]the questions about the ... 'leg' are subject to the same rule. If the jury may infer answers from the evidence that was provided it may do so but should not speculate." After the jury received the court's response, the prosecutor realized that the court's response was incorrect as to the jury's request for defendant's statement, which had been admitted through the testimony of a police officer, and could be considered by the jury in reaching its verdict. However, before the trial court was able to draft an amended response, the jury indicated that it had reached a verdict. The trial court accepted the verdict after denying the prosecutor's request that the verdict be held until the court amended its response.

8

> Contrary to defendant's contention, trial counsel's failure to call Gilmore as a witness does not shake our confidence in the outcome of the case. Instead, we conclude that on this record, defendant has failed to set forth a prima facie showing that the verdicts were "rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." (*Strickland*, *supra*, 466 U.S. at p. 702.) Accordingly, we summarily deny defendant's petition for a writ of habeas corpus.

*Sayad*, 2012 WL 469804 *12-13.

Sayad has failed to demonstrate that the state court's denial of this claim was an unreasonable application of federal authority. Trial counsel submitted a declaration discussing her reasons for not calling this witness. Answer, Exh. E at Exh. A. Trial counsel made a reasonable tactical decision not to call this witness as the testimony would be quite similar to the other witness who testified, Solla. Trial counsel also relied upon the testimony of another witness, Fisher. Reporter's Transcript ("RT") at 801-04. There is no indication that trial counsel was deficient for making this decision. Reasonable strategic choices by counsel such as this are "virtually unchallengeable" on federal habeas corpus review. *Strickland*, at 690; *see also Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009) (the court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight ...."). Her decision to use the testimony of Solla instead of Gillmore was also supported by the record. An accident reconstructionist for the defense submitted a letter to petitioner's prior trial counsel after reviewing the evidence. Answer, Exh. E at Exh. D. In the letter the reconstructionist discussed in detail how witness Solla's recollection was extremely helpful to the defense. *Id.* at 1. The report only briefly mentioned Gilmore. *Id.* at 2. The prosecution expert witness testified that in making his findings about the incident he did not consider Gilmore's statement as it was not consistent with the physical evidence. RT at 588. It made sense to rely on Solla, and it was not an unreasonable application of *Strickland* for failing to call Gilmore to provide similar testimony.

Even if petitioner could demonstrate that trial counsel was deficient, the state court found that she had still failed to show prejudice from the failure to call Gilmore. There was no indication that the jury would have credited Gilmore's testimony over Solla or that the result of the proceedings would have been different had she testified. The Court of Appeal's decision

9

1 was not AEDPA unreasonable as Gilmore's testimony was simply duplicative of Solla's
2 testimony. Nor will the jury's request for a copy of Gilmore's statement change the outcome
3 of this claim. Sayad's contention that this shows the jury would have returned a different verdict
4 with this testimony is far too speculative to warrant habeas relief. There was abundant evidence
5 that Sayad was driving with a high blood-alcohol level when she struck the victim who was
6 walking across the street and the jury clearly credited the prosecution's witnesses and expert
7 testimony. This claim is denied.

2. <u>Right to Confrontation</u>

Sayad next argues that her right to confrontation was violated when the trial court prevented the prosecution collision expert from being cross-examined based on Gilmore's statement.

<u>Standard</u>

The "Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

A court violates the "Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic." *Fenenbock v. Director of Corrections*, 692 F.3d 910, 919 (9th Cir. 2012). Indeed, a limitation on cross-examination that excludes testimony on a particular topic might violate the rule that "[r]estrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (quoting

*Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility . . . had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680; *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009). The focus of this inquiry "must be on the particular witness, not on the outcome of the entire trial," *Van Arsdall*, 475 U.S. at 680, such that defense counsel's ability to impeach other witnesses "is irrelevant" to whether the trial court violated the Confrontation Clause, *Slovik*, 556 F.3d at 754. A limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness. *United States v. Urena*, 659 F. 3d 903, 907-08 (9th Cir. 2011).

Analysis

The California Court of Appeal discussed the relevant background and denied this claim:

> Defendant argues that the trial court committed prejudicial error by ruling that her trial counsel could not use Samantha Gilmore's preliminary hearing testimony to cross-examine prosecution expert Olson regarding the information that he used to form his opinion that the collision was avoidable. We conclude there is no merit to the argument, which is based on a misreading of the record.
>
> The law is well-settled on this matter. "'While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matter he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. [Citation.] Ordinarily, the use of a limiting instruction that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter cures any hearsay problem involved, but in aggravated situations, where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem. [Citations.]' [Citation.] [¶] The courts have traditionally given both parties wide latitude in the cross-examination of experts in order to test their credibility. [Citations.] Thus, a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion. [Citation.] [¶] Nevertheless, the trial court must exercise its discretion pursuant to Evidence Code section 352 in order to limit the evidence to its proper uses. The exercise of this discretion may require exclusion of portions of inadmissible hearsay which were not related to the expert opinion. [Citation.] Or it may be necessary to sever

portions of the testimony in order to protect the rights of the defendant without totally destroying the value of the expert witness' testimony. [Citation.] In still other cases where the risk of improper use of the hearsay outweighs its probative value as a basis for the expert opinion it may be necessary to exclude the evidence altogether. [Citations.]" (*People v. Coleman* (1985) 38 Cal.3d 69, 92–93; *see Gardeley*, *supra*, 14 Cal.4th at pp. 618–619.)

When the issue of defense counsel's use of Gilmore's preliminary hearing testimony was first raised during the cross-examination of Olson, the trial court initially ruled that if the expert testified that he had not considered Gilmore's testimony in reaching his opinion, then the jury would not be allowed to hear her testimony. After further argument, however, the trial court modified its ruling, and told defense counsel that she could ask the expert if he had heard, but disregarded Gilmore's preliminary hearing testimony. If the witness responded affirmatively, and offered an explanation for his rejection of the testimony, then the door would be opened for defense counsel to explore the expert's reasons for his rejection of the testimony. When cross-examination resumed, defense counsel, without objection, laid the proper foundation to inquire as to Olson's consideration of Gilmore's preliminary hearing testimony. Defense counsel asked Olson if he had considered Gilmore's "statement" at the preliminary hearing. Olson replied, "I considered her statement, and I rejected it, wasn't consistent with the physical evidence." Although Olson's answer opened the door to additional questions, defense counsel apparently chose not to further explore the matter. FN10 Because the trial court's rulings did not preclude defense counsel's use of Gilmore's preliminary hearing testimony to cross-examine Olson, defendant's argument that the rulings violated her due process rights to a fair trial or present a defense necessarily fails.

> FN10. Given that the expert's testimony might not have been favorable to the defense, we cannot conclude on this record that defense counsel's failure to pursue the matter constitutes incompetency.

*Sayad*, 2012 WL 469804 *6-7.

While the trial court stated that Gilmore's statement could not be admitted due to hearsay concerns, Sayad was allowed to cross-examine the prosecution expert on why he chose not to rely on the statement in making his findings. RT at 583-86. Trial counsel asked the prosecution expert about Gilmore's statement and he said he did not consider it because it was not consistent with the physical evidence. RT at 588. Trial counsel could have further questioned the expert about the statement, but chose not to ask the expert why Gilmore's statement was contradicted by the physical evidence, which could have been detrimental to the defense.

This claim fails as the trial court did not prevent trial counsel from confronting the expert as alleged by Sayad. To the extent that Sayad argues she could not present a defense by not introducing Gilmore's statement, any such claim fails. Sayad was not prevented from presenting this witness, only her hearsay statement under state evidence laws. "State and federal

1  rulemakers have broad latitude under the Constitution to establish rules excluding evidence from
2  criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotations and citations
3  omitted). This did not preclude her from presenting a defense as the testimony would have been
4  duplicative of another witness' testimony as described in the prior claim. This claim is denied.

3.   Cumulative Error

Sayad argues that the cumulative effect from all of her claims denied her due process and she is therefore entitled to habeas relief.

Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that the conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See id*. at 883. However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error when there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

Analysis

The Court of Appeal rejected this claim stating "[w]e reject defendant's contention that the combined effect of the previously discussed purported errors requires reversal. Either considered individually or collectively, any purported errors were not prejudicial and did not deprive defendant of a fair trial or reliable verdicts." *Sayad*, 2012 WL 469804 *10. Here, the court has found no errors let alone multiple constitutional errors that would warrant habeas

relief. The failure to call Gilmore as a witness or use her statements in more detail while cross-examining the prosecution expert did not violate any of Sayad's rights. The testimony in question was not vital to her defense; rather, it was duplicative of another witness' testimony.[1] Nor was this a case where the government's case was weak. Sayad had a blood-alcohol concentration exceeding 0.15 percent when the car she was driving struck the victim causing severe injuries. This claim is denied.

## NO CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## CONCLUSION

The petition for writ of habeas corpus is denied on the merits.

The clerk will close the file.

IT IS SO ORDERED.

DATED: February 5, 2014

                                                                                               *Susan Illston*
                                                                                               SUSAN ILLSTON
                                                                                               United States District Judge

---

[1] Sayad raised other claims in her state appeal as part of the cumulative error claim that were not individually raised in this petition. There is no merit to the claims that the trial court treated a defense witness unfairly or made other erroneous comments that viewed cumulatively would warrant habeas relief.